UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| HUNTING ENERGY SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-CV-228 JD |
| | ) | |
| JAMES KAVADAS and TUFF ROD, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

James Kavadas was a salesperson for Hunting Energy Services, Inc., which sells pipe for use in horizontal directional drilling. While still employed by Hunting, Mr. Kavadas began developing plans with one of his customers to start a new company to sell that same product in direct competition to Hunting. Those plans came to fruition, and Mr. Kavadas left Hunting to form Tuff Rod LLC, which began selling pipe to that customer and other Hunting customers.

Hunting responded with this suit against Mr. Kavadas and Tuff Rod. It asserted a claim against both defendants for misappropriation of trade secrets, arguing that they built their business using the proprietary specifications for Hunting's pipe, along with other information like its sales data and projections. Hunting also asserted other claims against Mr. Kavadas, including for breach of his confidentiality and non-compete agreement, for breach of his duty of loyalty for having competed against Hunting while still employed with it, and for fraud for requesting travel reimbursements for meetings with his customer when they were actually discussing plans to start the new company and take away Hunting's business.

Discovery has now closed, and the defendants have moved for summary judgment on all of Hunting's claims. They also filed motions to strike expert opinions by a liability expert and a

damages expert. Hunting responded in opposition to each of those motions, and also filed a motion for default judgment. It argues that Mr. Kavadas and Tuff Rod intentionally destroyed documents even after becoming aware of their duty to preserve them for litigation. While some information has been recovered, other critical information, such as metadata that would show whether and when Mr. Kavadas accessed Hunting's confidential information following his employment, has been lost forever. Hunting argues that this destruction of evidence warrants a default judgment as a sanction, or at the very least justifies an inference that any lost evidence would have been adverse to the defendants' positions.

The Court begins by addressing Hunting's motion for default judgment. It then addresses the defendants' motion to strike Hunting's liability expert and their motion for summary judgment. Finally, the Court addresses the defendants' motion to strike Hunting's damages expert.

## I. FACTUAL BACKGROUND

Hunting Energy Services is a corporation that provides a range of products and services in the oil and gas industry. One of its lines of business involves products for use in horizontal directional drilling. This method of drilling allows pipes to be inserted underground without having to dig a trench along the length of the pipe, making it useful for pipes that need to be installed under rivers or roadways, for example. Using this method, a portable drilling machine drives drill pipe underground at a shallow angle. As the pipe extends farther underground, additional lengths of pipe are attached to the end to continue drilling until the pipe reaches the ground on the other side. Once the path has been drilled, pipes or cables can be pulled through and placed without the need to dig a trench.

A key component of this process is the drill pipe itself. Hunting manufactures a premium-grade horizontal-directional drill pipe. The chemistry of the pipe's steel is a key factor in how

well the pipe performs in the field, and Hunting uses a proprietary formula that it developed over years of trial and error and field and lab testing. The formula for Hunting's pipe is set forth in a specification that outlines the pipe's chemical composition, as well as its mechanical properties and the testing and quality control requirements. The formula does not contain set amounts for each ingredient; it specifies acceptable ranges of each of the alloying elements and maximum allowable levels for certain contaminants. Once the pipe has been forged based on that formula, it then goes through a treatment process known as quenching and tempering, during which the pipe is heated and then rapidly cooled. There are many variables in the way that process can be performed, and those variables can need to be adjusted due to even minor changes in the pipe's chemistry. The performance of Hunting's pipe in the field is a function of the chemistry, the quenching and tempering of the steel, and Hunting's internal quality requirements. Once the pipe is forged according to that process, it undergoes a finishing process that includes threading the ends of the pie.

James Kavadas joined Hunting as a salesperson in 2008. His territory included a number of states in the Midwest, plus Western Canada. In July 2009, Mr. Kavadas signed a contract entitled "Agreement Relating to Inventions, Confidential Information and Other Intellectual Property." In the agreement, Mr. Kavadas agreed not to use any of Hunting's confidential information except as required by his position, not to disclose any of Hunting's confidential information without prior authorization, and to return all confidential information in his possession upon the termination of his employment. The agreement also included non-compete provisions. Mr. Kavadas agreed that for two years after the termination of his employment with Hunting, he would not compete for, solicit, or provide services to any customer with whom he had material contact and dealings in the last two years of his employment.

Sometime later, Mr. Kavadas' boss asked him to consider changing his compensation structure from salary-only to a combination of salary and commissions. Mr. Kavadas was not required to do so, but after considering the arrangement he agreed to the new compensation structure. His supervisor thus gave him a two-page offer letter that outlined the new terms of his compensation, including his salary, commissions, benefits, and reimbursements. Mr. Kavadas signed that offer letter in February 2013.

During his time with Hunting, Mr. Kavadas' best customer was Underground Tools, Inc., a dealer located in Minnesota. UTI's owners were Mike Burns and Jamie Lindahl. In January 2013, Mr. Burns and Mr. Lindahl approached Mr. Kavadas about forming a new company called Tuff Rod, which would sell drill pipe in competition to Hunting. They wanted to have the pipe manufactured in China and imported, which they believed would allow them to sell it for cheaper prices. Mr. Kavadas agreed, and the three of them began making arrangements to develop their new business, as Mr. Kavadas remained employed by Hunting.

Hunting alleges that Mr. Kavadas began using and disclosing its trade secrets and confidential information at that point as part of his efforts to develop Tuff Rod. Mr. Kavadas began speaking to a supplier in China, Wuxi Double Horse Drilling Tool Co., which he wanted to manufacture the pipe. In January 2013, Mr. Kavadas emailed the specification for Hunting's pipe to himself, for reasons he was unable to explain except to note that he also drafted Tuff Rod's specification that month. Although the chemical formulas contained in Tuff Rod's specification were not the same as Hunting's, much of the rest of its content matched Hunting's verbatim. Mr. Kavadas even admitted that, other than its chemistry, he created Tuff Rod's specification using Hunting's. Mr. Kavadas asserts that the chemistry included in the specification had been proposed to him by Wuxi, but that communication has never been

produced. Mr. Kavadas later proposed "tweaking" the chemistry, even though he is not a metallurgist.

Over the ensuing months, Mr. Kavadas also drafted a set of projections for sales of Tuff Rod's pipe, and he updated those projections on multiple occasions. Throughout that time, he had access to his own sales data and projections for Hunting's products. In addition, in January 2014, Mr. Kavadas gathered the sales data for all of Hunting's salespeople, to compile into a presentation for the annual sales meeting. Shortly after that meeting, Mr. Kavadas sent an email to Wuxi in which he mentioned Tuff Rod's projections and noted that they had "spent the last couple months (especially last 4 weeks) learning what each company wants and needs." Mr. Kavadas was unable to recall during his deposition what he had been doing over that time to learn the companies' needs, and testified that he came up with the projections based only on his experience in the industry.

Also in January 2014, Mr. Kavadas asked Wuxi if they could send him the technical drawings for Vermeer's pipes, another competing seller of drill pipe. Wuxi declined, noting that they had a confidentiality agreement with Vermeer. Mr. Kavadas forwarded the email to Mr. Burns and Mr. Lindahl, saying, "Need to move to plan B for tong space dimensions," referring to a particular dimension of drill pipe. Two weeks later, Mr. Kavadas sent Wuxi tong space dimensions for five different lengths of pipe. Mr. Kavadas testified that he determined those dimensions by holding his phone up to Hunting's finished pipes to estimate their length. However, those dimensions—set forth in acceptable ranges, not specific lengths—matched exactly the dimensional ranges in Hunting's drawings for its pipes after forging. And even though the lengths were each in quarter-inch increments, Mr. Kavadas wrote the decimals out to the thousandth of an inch, just as in Hunting's drawings.

As part of his job as a salesperson for Hunting, Mr. Kavadas was required to make sales calls to his customers. Three of those customers, including UTI, were located in Minnesota. Mr. Kavadas thus made a number of trips to Minnesota in the same period as he was developing Tuff Rod. On each of those trips, Mr. Kavadas would meet with each of the three customers on successive days. Mr. Kavadas admits that, when he met with UTI, he would sometimes also discuss Tuff Rod's business with Mr. Burns and Mr. Lindahl. As with all of his travel, Mr. Kavadas submitted expense reports to Hunting for reimbursements for the costs of his travel.

Hunting was not aware during this time that Mr. Kavadas was developing a new competing business. In fact, Mr. Kavadas even communicated with Wuxi using a pseudonym instead of his real name. By March 2014, however, Tuff Rod had already imported pipe into the country and was ready to begin making sales. On March 31, 2014, Mr. Kavadas gave his two weeks' notice to Hunting; Hunting terminated his employment immediately. The next day, Tuff Rod was officially formed and began operations. Tuff Rod thereafter began selling its drill pipe in competition to Hunting, and was successful in selling to many customers who had previously purchased from Hunting.

Prior to leaving Hunting, Mr. Kavadas had communicated with Mr. Burns and Mr. Lindahl and Tuff Rod's suppliers using his personal email account and another account they created for use for Tuff Rod business, usadrillpipe@yahoo.com. Shortly after Tuff Rod officially launched, they deleted the usadrillpipe account, so its contents were destroyed. In addition, Mr. Kavadas' personal email account has not be searched in response to the requests for production in this case, even though the defendants agree that it would contain responsive documents. Mr. Kavadas also had many Hunting documents on his personal computer, as he used that computer

as his work computer. Upon leaving Hunting, though, he did not return any of the documents or files in his possession.

In December 2014, Hunting sent Mr. Kavadas a cease and desist letter. The letter alleged that Mr. Kavadas had used Hunting's trade secrets and confidential information in forming Tuff Rod. The letter contended that Mr. Kavadas was in breach of his non-compete agreement and that he had misappropriated its trade secrets, among other claims. The letter further outlined the remedies Hunting believed it was entitled to, including damages, attorneys' fees, and an injunction. The letter also insisted that Mr. Kavadas identify all of the Hunting information in his possession and allow Hunting to inspect his computer and electronic devices. In March 2015, Hunting sent a letter to Mr. Burns, notifying him that litigation was "imminent" and directing him to preserve all relevant documents. Mr. Burns forwarded that letter to Mr. Kavadas. After receiving that letter, though, Mr. Kavadas intentionally deleted from his computer all of the files relating to Hunting. Those included the specification for Hunting's pipe and various other confidential information. A computer expert was later able to recover some of the files Mr. Kavadas deleted. However, the metadata for those files, which would have shown when Mr. Kavadas had last accessed them, among other information, was lost forever.

Hunting filed this suit in May 2015.[1] Its complaint first asserts a claim against Mr. Kavadas and Tuff Rod for misappropriation of trade secrets. It also asserts three claims against Mr. Kavadas alone, including breach of contract, breach of fiduciary duty, and fraud. Discovery

---

[1] The Court has diversity jurisdiction under 28 U.S.C. § 1332. According to the complaint, Hunting is a corporation that is incorporated in the state of Delaware with its principal place of business in Texas, so it is a citizen of Delaware and Texas [DE 38 ¶ 1]; Mr. Kavadas is a citizen of Indiana, *id.* ¶ 6; and Tuff Rod is a limited liability company whose sole member, Michael Burns, is a citizen of Minnesota, *id.* ¶ 3, so Tuff Rod is a citizen of Minnesota. The amount in controversy also exceeds $75,000.

has now closed, and the parties have filed a number of motions. Hunting moved for a default judgment for the defendants' spoliation of evidence. In the alternative, it requests an adverse inference that the destroyed evidence would have been unfavorable to the defendants. The defendants filed a motion for summary judgment, as well as motions to strike testimony by two expert witnesses for Hunting. All of those motions have been fully briefed.

## II. MOTION FOR DEFAULT JUDGMENT

Hunting moves for default judgment as a sanction for the defendants' destruction of evidence. In the alternative, it requests an adverse inference that the materials in question would have been unfavorable to the defendants. Hunting identifies four categories of evidence that was destroyed or that the defendants failed to produce: (1) samples of drill pipe that Tuff Rod had tested, the results of which the defendants' expert relied on; (2) Mr. Kavadas' personal email account—the "jkcubs" account—which the defendants failed to search for documents responsive to Hunting's discovery requests and the Court's order to compel; (3) the usadrillpipe@yahoo.com email account, which was deleted shortly after Tuff Rod began operations; and (4) documents on Mr. Kavadas' personal computer, which he "purged" of files relating to Hunting even after receiving a demand letter and a preservation request.

Parties have a duty to preserve evidence once they know or should know that litigation is imminent. *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008); *Weitzman v. Maywood, Melrose Park, Broadview Sch. Dist. 89*, No. 13 C 1228, 2014 WL 4269074, at *2 (N.D. Ill. Aug. 29, 2014) ("When a party first reasonably foresees that litigation is on the horizon, it must suspend its ordinary policies governing how information is retained or destroyed and put into place a litigation hold to preserve relevant material."). If a party violates that duty in bad faith, a court can enter default judgment or draw an adverse inference that the destroyed evidence would have been unfavorable to the party's position. *Park v. City of Chi.*, 297 F.3d 606,

615 (7th Cir. 2002); Fed. R. Civ. P. 37(e)(2). In this context, "'bad faith' means destruction for the purpose of hiding adverse information." *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998); *Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013) ("[T]he crucial element is not that the evidence was destroyed but rather the reason for the destruction."). Absent a finding of bad faith, a court can take lesser measures as may be necessary to cure any prejudice if a party has failed to take reasonable steps to preserve evidence. *See* Fed. R. Civ. P. 37(e)(1). The authority to impose sanctions comes from both the federal rules and a court's inherent authority to manage judicial proceedings and to regulate the conduct of those appearing before it. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 775–76 (7th Cir. 2016).

### A.     Pipe Samples

First, Hunting argues that the defendants failed to preserve pipe samples that Tuff Rod sent for testing. In September 2015, Mr. Lindahl sent three samples of pipe to Element Materials Technology for testing on behalf of Tuff Rod: one Hunting pipe, one Tuff Rod pipe, and one pipe from a competitor. Mr. Lindahl states that he sent those samples for testing in the ordinary course of Tuff Rod's business, not for purposes of litigation. He did not request that the samples be returned once the testing was completed, so the pipe was disposed of by Element Materials following the testing. The defendants and their expert argue that the test results show that Tuff Rod's pipe is not the same as Hunting's, and is more comparable to the competitor's. Hunting argues that it has been prejudiced by the loss of samples because it cannot perform its own confirmatory tests on those samples and it cannot examine identifying information on the samples that would indicate their origin and date. Hunting argues that those details are important to its case in light of its theory that the defendants modified their pipe over time to more closely match Hunting's formula.

First, Tuff Rod's duty to preserve evidence had already attached by the time these samples were destroyed, as Hunting had filed its complaint months earlier. *Cohn v. Guaranteed Rate, Inc.*, 318 F.R.D. 350, 354 (N.D. Ill. 2016) ("At the latest, this duty [to preserve] attaches when the plaintiff informs the defendant of [its] potential claim."). All Tuff Rod had to do to prevent these samples from being destroyed was to request that they be returned after the testing was done, but it failed to do so. *See* Fed. R. Civ. P. 37(e) (authorizing sanctions to cure prejudice for evidence that is lost "because a party failed to take reasonable steps to preserve it"). And when Tuff Rod received the results, it clearly drew a connection to Hunting's claims of misappropriation: Mr. Kavadas sent an email to his partners with the test results, stating, "Our steel is no where [*sic*] near Hunting. We are very close to Vermeer." [DE 104-15 p. 1–2]. Yet, despite being under an obligation to preserve evidence, and understanding the relevance of the tests to this case, the defendants failed to preserve this evidence.

The Court must therefore consider whether sanctions are warranted for this loss of evidence pursuant to its inherent authority.[2] *See Ramirez*, 845 F.3d at 776. The defendants argue that sanctions are not warranted for the loss of this evidence because Hunting could have bought pipes made by each of the different companies and performed its own tests on those samples at any time during (or before) this litigation, just as Tuff Rod did as to these samples. The Court agrees for that reason that a default judgment or adverse inference are not appropriate as to this evidence. This was not evidence that Hunting needed to support its claim; the harm is that Hunting is impaired in its ability to fully respond to the defendants' use of this evidence.

---

[2] As the defendants note, Rule 37(e) is not applicable here, as it applies to electronically stored information.

Hunting has still been prejudiced in that respect, though. Hunting's inability to perform confirmatory tests on the samples is perhaps less concerning, as the fact that the testing was performed by an independent lab provides a basis for confidence in its accuracy. The failure to provide identifying information for each of the samples (which would have been available had the samples themselves been preserved) is more problematic, though. Without information about the samples' origin and when they were manufactured, Hunting cannot meaningfully respond to this evidence and place it in its context. It would not be fair to allow the defendants to rely on this evidence—the support for which they failed to preserve—without allowing Hunting to respond to it in that manner. Accordingly, the Court believes that the appropriate consequence is to bar the defendants from relying on these tests, so the Court will not permit the defendants to use these test results at trial. *See* Fed. R. Civ. P. 37 advisory committee notes to 2015 amendment ("[I]t may be appropriate to exclude a specific item of evidence to offset prejudice caused by failure to preserve other evidence that might contradict the excluded item of evidence.").

**B.      "jkcubs" E-Mail Account**

Next, Hunting seeks sanctions for the defendants' failure to search the "jkcubs" email account for documents responsive to its requests for documents, which were also the subject of an order compelling discovery. Unlike the other documents at issue, these documents have not been destroyed, they just have not been produced. This was Mr. Kavadas' personal email account, which he used to communicate with Wuxi and others while still employed by Hunting. The parties agree that this account contains emails that would be responsive to Hunting's document requests. In addition, when a dispute arose as to the scope of those requests, the Court granted a motion to compel, ordering the defendants to produce emails through April 1, 2016 relating to their communications with Tuff Rod's suppliers. [DE 73]. Complying with that order would have required the defendants to search this email account, but they have not done so.

The defendants represent that this account was collected by their discovery vendor as part of the discovery process. For unknown reasons, however, this account was not included in the documents that were searched in producing discovery. That fact was not disclosed to Hunting until it came to light during Mr. Kavadas' deposition, shortly before the close of discovery. Defense counsel represent that that was the first they learned of this as well. Hunting then moved to extend the discovery deadline to address this and other issues, but the defendants opposed that motion and the magistrate judge denied it, noting that the deadline to file motions to compel discovery had passed months ago.[3]

The defendants argue that no sanctions are warranted for their failure to produce these documents because it was an "innocent oversight." Conspicuously absent from their response brief, however, is a representation that they have since cured that oversight. To the contrary, they admit that they have not done so. The defendants' oversight might have been innocent initially, but that is no longer the case—in failing to produce documents from this account, the defendants are openly violating the Court's order to compel and their Rule 26(e) obligation to supplement their discovery responses.

Under Rule 26(e), a party who has responded to a request for production must supplement its response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). The defendants learned that their response was incomplete during Mr. Kavadas' deposition in April 2017. Over seven months later, when they responded to the motion for default judgment, they still had not

---

[3] The defendants argue that the motion for default judgment is itself untimely under the deadline for discovery motions. This is not a motion to compel or for a protective order, though, so that deadline is not applicable here.

produced this discovery.[4] The fact that discovery has since closed does not relieve them of this obligation, either, as "a party's obligation to supplement discovery under Rule 26(e) does not end when discovery closes." *MemberSelect Ins. Co. v. Electrolux Home Prod., Inc.*, No. 13 CV 4097, 2015 WL 6083201, at *6 (N.D. Ill. Oct. 15, 2015); *accord United States v. Dish Network, L.L.C.*, No. 09-3073, 2016 WL 29244, at *6 (C.D. Ill. Jan. 4, 2016); *Francis v. AIT Labs.*, No. 1:07-CV-0626, 2008 WL 2561222, at * 1 (S.D. Ind. June 26, 2008); *Episcopo v. Gen. Motors Corp.*, No. 02 C 8675, 2004 WL 628243, at * 7 (N.D. Ill. Mar. 29, 2004). Moreover, the magistrate judge's denial of the motion to extend discovery does not absolve the defendants of their discovery violations—the defendants cannot get off scot-free for these violations and avoid producing these relevant materials just because they were able to run out the clock on the discovery period through their own neglect.

The defendants also argue that Rule 37(e) is inapplicable here because these documents were not "lost," only withheld. That is true, but Rules 37(b) and (c) do apply. Under Rule 37(b), a Court may impose sanctions if a party "fails to obey an order under Rule . . . 37(a).' Fed. R. Civ. P. 37(b)(2). There is no dispute that the Court's order required the defendants to produce responsive emails from this account and that they have not done so, thus failing to obey the Court's order. Likewise, Rule 37(c) authorizes sanctions if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e)." Fed. R. Civ. P. 37(c)(1). The defendants learned that their discovery responses were incomplete yet failed to supplement them as required by Rule 26(e). The Court also has inherent authority to impose sanctions for discovery abuses. *Ramirez*, 845 F.3d at 776.

---

[4] Nor, during the period in which these motions have been pending, has either party notified the Court that these documents have now been produced.

The defendants' conduct and ongoing failure to produce these documents leave the Court with no choice but to impose sanctions. The defendants argue that the prejudice is limited because any emails that Mr. Kavadas sent from this account to Mr. Burns or Mr. Lindahl would have been produced from those individuals' accounts. However, those individuals' accounts would not necessarily include emails between Mr. Kavadas and Tuff Rod's suppliers in China.[5] And the extent of information that Mr. Kavadas sent to the suppliers is central to Hunting's claims. The Court does not find that default judgment is warranted on this basis, though, in part because this conduct is potentially remediable, and also because lesser sanctions would suffice to address the prejudice, as discussed below. However, the Court agrees with Hunting that an adverse inference is warranted, at least at this stage. The defendants have the ability to—and have been ordered to—produce emails from this account. In failing to do so, they are willfully preventing Hunting from accessing or relying on those documents in support of its case, thus warranting an inference that these materials would be harmful to their case. The Court will consider lifting this sanction for purposes of trial, though, if the defendants produce all responsive documents from this account within 28 days and compensate Hunting for the costs it incurred due to the untimely disclosure.

**C.      usadrillpipe@yahoo.com Account and Mr. Kavadas' Personal Computer**

Finally, Hunting seeks sanctions for the defendants' deletion of the usadrillpipe@yahoo.com email account and Mr. Kavadas' "purge" of discoverable information from his computer. The defendants created and used the usadrillpipe account to communicate with suppliers and others while they were in the process of developing Tuff Rod. After they

---

[5] The defendants suggest that Hunting should have sought discovery from Wuxi, but they have not shown that seeking discovery from a foreign non-party to this litigation would have been practicable. As Hunting outlines in its reply, that could be a protracted process with questionable likelihood of success.

officially began Tuff Rod in April 2014, however, at which time they had Tuff Rod-hosted email accounts, they deleted usadrillpipe account, leading to the loss of its contents. As to the computer, Mr. Kavadas used his personal computer for his work for Hunting, so it contained many Hunting documents. Those included the specification for Hunting's pipe and other confidential information that Hunting accuses the defendants of misappropriating. At some point in early 2015, however, he intentionally deleted all Hunting-related documents from that computer. The defendants' discovery consultant was successful in restoring some of those documents, but it has no way of knowing how many additional documents were deleted but not recovered. In addition, the defendants were unable to restore any of the metadata for any of those files, which would have included information about when Mr. Kavadas accessed those files.

There is no question that the duty to preserve evidence had attached before Mr. Kavadas deleted the documents from his computer. In December 2014, counsel for Hunting sent Mr. Kavadas a cease and desist letter. The letter outlined the claims that Hunting believed it had against Mr. Kavadas and the damages it would seek, and the letter insisted that Mr. Kavadas provide Hunting with a variety of information and with access to his computers and electronic devices. In March 2015, Hunting also sent a letter to Mr. Burns stating that litigation between Hunting and Mr. Kavadas "is imminent," and directing Mr. Burns to preserve evidence. Mr. Burns forwarded a copy of that letter to Mr. Kavadas. The defendants' attorneys also issued the defendants a litigation hold letter of their own around the same time. Nonetheless, sometime later, Mr. Kavadas intentionally deleted all Hunting files from his computer.

The defendants dispute, however, whether the duty to preserve had attached when the usadrillpipe email account was deleted. That occurred in April or May 2014, before suit was filed and before Hunting had sent a demand letter or preservation request. In arguing that the

defendants were nonetheless aware of the likelihood of litigation at that point, Hunting relies on an email that Mr. Kavadas sent to Mr. Burns and Mr. Lindahl in October 2013. In the email, Mr. Kavadas identified a number of issues that needed to be addressed in developing Tuff Rod as a business. Under the heading of "Documentation," he stated:

> One of the things my attorney strongly suggested was that in case Hunting tries to enforce non-compete we need to have documentation trail about job description etc. I need you guys to start sending me some mails inquiring about a new venture you guys are looking at and wondered if I were interested as Purchasing Manager etc.

[DE 104-18 p. 3 (verbatim)]. Below that Mr. Kavadas listed four "Major Risks in the Business Model," the fourth of which was "JK [James Kavadas] getting sued." *Id.*

The duty to preserve evidence attaches when a party knows or should know that litigation is imminent. *Trask-Morton*, 534 F.3d at 682. Court have also described that duty as applying when a party has "reason to anticipate litigation," *Buonauro v. City of Berwyn*, No. 08 C 6687, 2011 WL 3754820, at *6 (N.D. Ill. Aug. 25, 2011), "reasonably foresees that litigation is on the horizon," *Weitzman*, 2014 WL 4269074, at *2, or has notice "that litigation is likely to commence," *Larson v. Bank One Corp.*, No. 00 C 2100, 2005 WL 4652509, at *10 (N.D. Ill. Aug. 18, 2005); *see also Jones v. Bremen High Sch. Dist. 228*, No. 08 C 3548, 2010 WL 2106640, at *5 (N.D. Ill. May 25, 2010) ("This duty [to preserve] arises when a reasonable party would anticipate litigation and does not depend on a court order."); *Zubulake v. UBS Warburg LLC*, 200 F.R.D. 212 (S.D.N.Y. 2003) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.").

The Court finds that standard was met here by the time the usadrillpipe account was deleted. In his October 2013 email, Mr. Kavadas identified "getting sued" as one of the "Major Risks in the Business Model." [DE 104-18 p. 3]. He also mentioned having spoken to an attorney

about the potential to be sued by Hunting to enforce his non-compete agreement. And perhaps most notably, he asked his partners to send him phony emails to create a paper trail to be used to defend against such a suit. The defendants argue that this does not suffice because "litigation is an ever-present possibility in our society," so the mere possibility of a future suit cannot trigger the duty to preserve evidence. This was not a mere possibility of future litigation, though. The defendants anticipated a specific claim by a specific party, had discussed that claim with an attorney, and identified "getting sued" as a "major risk." They also viewed litigation as sufficiently likely to warrant fabricating a paper trail; they can hardly argue that they were entitled to destroy harmful evidence at the same time they were discussing creating evidence to be used in their favor.

Hunting had not filed suit or sent a cease and desist letter at that point, but that was because the defendants did not disclose their plans or activities, so Hunting had no reason to know about them. In fact, Mr. Kavadas went so far as to communicate with the suppliers using a pseudonym in order to conceal his participation. The defendants also argue that, at the time the email was sent in October 2013, they were still in the planning phases of determining whether the business was a viable option. When the usadrillpipe account was deleted in April or May 2014, though, they had already gone ahead with the idea and formed the business. The defendants clearly anticipated that litigation was likely once they began competing and Hunting learned of their plans, so the duty to preserve had attached by that time.

Other courts have found that the duty to preserve attached in similar circumstances. In *Buonauro*, the court found that a city was obligated to preserve evidence relevant to a licensing dispute by the time the matter was discussed at a committee meeting, as the minutes for that meeting indicated that the council "understood that its consideration of this issue included

potential litigation." 2011 WL 3754820 at *6. And in *Zubulake*, which involved employment claims, the court held that the duty to preserve was triggered even while the plaintiff was still employed. 220 F.R.D at 216–17. Emails in which other employees discussed the plaintiff included "attorney client privilege" in the subject line, even though the emails did not include attorneys. One of the employees also testified that he feared litigation by that time. The court found that "almost everyone associated with [the plaintiff] recognized the possibility that she might sue," so the duty to preserve had attached. *Id.* at 217. Here, Mr. Kavadas feared litigation, noting it as one of the "major risks" of the business; he directly referred to the possibility that Hunting would sue to enforce the non-compete agreement; and he sought to prepare for that potentiality. Thus, the Court concludes that the duty to preserve had attached by the time the usadrillpipe account was deleted.

This destruction of both the usadrillpipe account and the files on Mr. Kavadas' computer carries a great potential for prejudice to Hunting. Mr. Kavadas used the usadrillpipe account to communicate with his suppliers while he was developing Tuff Rod's drill pipe, and the contents of those communications are central to Hunting's claims. An unknown number of those communications have been lost, though. The defendants claim that Wuxi sent them proposed chemistries for the pipe, but that email has never been produced. There are other instances as well where the defendants testified about specific communications (or the lack thereof) that have not been produced or cannot be verified. The deletion of documents from Mr. Kavadas' computer is also highly prejudicial. It is undisputed that Mr. Kavadas had many of Hunting's confidential files on his computer even after his employment ended. A key question to Hunting's claims is whether Mr. Kavadas continued to access or rely on that confidential information after his employment. The metadata to those files may have answered that question, as it would show

when those files were last accessed. However, the metadata was lost when the files were deleted, and the defendants' discovery consultant represents that it is impossible to restore that information. The destruction of that important evidence thus cannot go unanswered.

The Court finds that the appropriate resolution is to present this issue to the jury and instruct it that it should draw an adverse inference as to any documents it concludes were destroyed in bad faith. To begin with, the Court does not find that default judgment is warranted. Some of the disputed elements of Hunting's claims are unrelated to the evidence in question— such as whether Hunting's information constitutes trade secrets, and whether the non-compete agreement is enforceable—so entering a default judgment would be punitive, not compensatory. The Court does not find that the circumstances here warrant that response.

In *Global Material Techs., Inc. v. Dazheng Metal Fibre Co.*, No. 12 CV 1851, 2016 WL 4765689 (N.D. Ill. Sept. 13, 2016), on which Hunting relies, the defendants not only destroyed evidence and failed to produce discovery, they also repeatedly lied to the court and committed a number of other discovery violations. And in *Krumwiede v. Brighton Assocs., L.L.C.*, No 05 C 3003, 2006 WL 1308629 (N.D. Ill. May 8, 2006), the defendant modified or deleted thousands of files even after the complaint was filed and after the defendant was ordered to turn over the computer, and also lied to the court. Here, although Hunting disbelieves the sincerity of the defendants' explanations for why they destroyed the documents, the defendants have been forthright in admitting that the documents were destroyed. They have also made at least some effort to mitigate the prejudice, restoring as many of the deleted files as they could from Mr. Kavadas' computer.

In addition, the Court believes that an adverse inference would appropriately account for the destruction of this evidence should the jury find the destruction to be in bad faith. An adverse

inference would equate to a finding that Mr. Kavadas disclosed Hunting's specification to Tuff Rod's supplier, and that he improperly used and disclosed other confidential information while working for Hunting and after moving to Tuff Rod. That would establish that he violated the confidentiality agreement and his duty of loyalty, and that the defendants misappropriated any information found to be a trade secret. Given the severity of that outcome, the greater sanction of default judgment is unwarranted. At the same time, imposing no sanctions at all, as the defendants suggest, would be inappropriate. The prejudice to Hunting is substantial, and a finding that the defendants destroyed the documents in bad faith would justify this significant consequence.

The Court also believes that it is appropriate for the jury, rather than the Court, to decide whether the destruction of this evidence was in bad faith. The committee notes to Rule 37 contemplate that possibility. Fed. R. Civ. P. 37 advisory committee notes to 2015 amendments ("If a court were to conclude that the intent finding should be made by a jury, the court's instruction should make clear that the jury may infer from the loss of the information that it was unfavorable to the party that lost it only if the jury first finds that the party acted with the intent to deprive another party of the information's use in the litigation."). The Seventh Circuit has also issued a pattern jury instruction addressing an adverse inference finding. Seventh Circuit Pattern Civil Jury Instructions § 1.20.

There is evidence from which the jury could make such a finding. The defendants anticipated litigation with Hunting and surely knew that these materials would be relevant to that litigation. And by the time he deleted the documents from his computer, Mr. Kavadas had received a cease and desist letter in which Hunting demanded access to his computer, plus preservation letters from Hunting and from his own attorneys. He nonetheless intentionally

deleted hundreds of files. Mr. Kavadas had also previously suggested fabricating a paper trail to defend against Hunting's claim, which could suggest a willingness to manipulate the documents in his favor. The jury could thus find that the defendants destroyed the evidence in order to cover their tracks. On the other hand, the defendants proffer facially neutral reasons for these actions. They indicate that they closed the usadrillpipe account because they created their own Tuff Rod-hosted email accounts, so the account was no longer necessary. Mr. Kavadas also states that he deleted the documents from his computer because he believed he was not supposed to have Hunting documents on his computer anymore.

If the jury accepts the defendants' explanations, then an adverse inference would not be appropriate. *Bracey*, 712 F.3d at 1019 ("[T]he crucial element is not that the evidence was destroyed but rather the reason for the destruction."); *Mathis*, 136 F.3d at 1155 ("That the documents were destroyed *intentionally* no one can doubt, but 'bad faith' means destruction for the purpose of hiding adverse information."). This issue thus depends on a credibility analysis and a finding as to the defendants' mental state. Those are prototypical functions of a jury and questions that the jury will be able to fairly evaluate and resolve. In addition, Mr. Kavadas will already be a witness in this case, and his credibility will already be a central issue as to Hunting's claims, so allowing the jury to make this finding as well is appropriate.

Accordingly, the Court grants Hunting's motion to the extent that the Court will give an adverse inference instruction, instructing the jury that it should infer that any destroyed documents would have been adverse to the defendants if it finds that the documents were destroyed in bad faith.

### III. MOTION TO STRIKE MS. ROMERO'S OPINION

The Court next addresses the defendants' motion to strike expert opinions by Andrea Romero. Ms. Romero works for Hunting as a metallurgical and quality engineer. Hunting

disclosed Ms. Romero as a non-retained expert witness to testify on a number topics related to Hunting's products and their value, and her analysis of Tuff Rod's products. The defendants moved to strike certain of those opinions. First, they seek to exclude any opinion about what Ms. Romero believes the defendants intended, were thinking, or were trying to do with their products. In response, Hunting indicated that it has no intent to elicit testimony from Ms. Romero on those subjects. Accordingly, this aspect of the motion is moot.

Next, the defendants move to exclude any opinion about what it would take to reverse engineer Hunting's pipe specification. In arguing that Hunting's specification does not constitute a protectable trade secret, the defendants argue that it can be easily recreated by performing a $3,000 test to determine its chemical composition. The defendants argue that this shows that Hunting's pipe specification is readily ascertainable by proper means, in which case it would not qualify for protection as a trade secret. Ind. Code § 24-2-3-2. Ms. Romero offers a number of responses to that contention. She opines that a single test, or even a series of tests, would not provide sufficient information to recreate Hunting's specification or to manufacture comparable pipe. She notes, among other things, that the specification sets forth acceptable *ranges* of various elements, and that while a chemical test could provide a single data point, it would not establish the ranges set forth in the specification. She further notes that even small changes in the chemistry could require adjustments to the way in which the material is treated—a process known as "quenching and tempering," which entails heating and cooling the pipe. A chemical test would not disclose the parameters of that process, nor would it reveal the quality control requirements set forth in the specification. Thus, Ms. Romero opines that reverse engineering Hunting's specification would require an iterative, trial-and-error process that would take over a year and would cost hundreds of thousands of dollars, and may even be impossible.

The defendants move to exclude these opinions under Rule 702 and *Daubert*, arguing that the opinions are not sufficiently reliable. Under Rule 702, an expert witness must be qualified, the testimony must be "the product of reliable principles and methods," and the expert must "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702. A court has a gatekeeping role to ensure that expert testimony meets those criteria. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834–35 (7th Cir. 2015). In conducting that analysis, a court is not concerned with the correctness of the expert's conclusions, but only "the soundness and care with which the expert arrived at her opinion." *Textron*, 807 F.3d at 834.

The defendants argue that Ms. Romero's testimony is not sufficiently reliable, as she has never attempted to reverse engineer drill pipe herself, nor has she personally developed a new drill pipe. They further argue that her opinions have not been tested or peer reviewed and do not have a known error rate. As to certain types of expert testimony, those factors could be important. *See Daubert*, 509 U.S. at 593–94 (identifying a non-exclusive set of factors that may be relevant in evaluating the reliability of expert testimony). However, "the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily or exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "An expert's testimony is not unreliable simply because it is founded on [her] experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *see also United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001) (noting that "[i]n certain fields, experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony"). In those circumstances, experts still "cannot simply assert a 'bottom line,'"

but their testimony may be sufficiently reliable if they explain how their experience leads them to their conclusions in light of the facts of the case. *Metavante*, 619 F.3d at 761–62; *see also Lees v. Carthage College*, 714 F.3d 516, 524–25 (7th Cir. 2013).

Here, the Court finds that Ms. Romero has sufficiently explained how her education and experience lead her to the conclusions she offers, such that they satisfy Rule 702's reliability elements. Ms. Romero has a bachelor's degree in metallurgical and materials engineering, and has over 20 years of metallurgical experience in various industrial settings. She has been Hunting's metallurgical and quality engineer since 2011. In that role, she audits steel mills and other steel suppliers to ensure they meet Hunting's specifications and quality requirements. That education and experience gives Ms. Romero an understanding of what it takes to manufacture pipe, as well as an understanding of the uses and limitations of the tests that the defendants rely on as a means of reverse engineering the pipe.

Ms. Romero also explains how those factors lead to her conclusions in this case. She notes that a chemical analysis performed on Hunting's pipe would only give a single data point as to its chemical composition, whereas the specification defines the pipe's chemical composition in terms of acceptable ranges of each of the various elements. Thus, tests on many different pipes would have to be performed to begin to approximate the ranges in the specification. Ms. Romero notes that another step in manufacturing the pipe is the quenching and tempering process, which could need to be adjusted based on even small changes to the chemical composition of the pipe. Recreating the pipe would thus require purchasing samples of pipe in varying chemistries, experimenting with the quenching and tempering process for each sample, and then testing the performance of each pipe. Ms. Romero noted that samples of pipe would have to be ordered in large lots, as suppliers generally do not manufacture individual lots for

testing. Each lot would cost tens of thousands of dollars and could take a month or more to manufacture, and each test could cost thousands of dollars. That process could have to be repeated multiple times to adjust the chemistry, the quenching and tempering, and the quality control, in order to produce a quality pipe. In light of this process, Ms. Romero opined that developing a pipe that performs comparably to Hunting's "would easily take over a year and hundreds of thousands of dollars."

Given the nature of this testimony, this explanation more than suffices to trace Ms. Romero's reasoning from her education and experience to her conclusions, so her testimony is sufficiently reliable to meet Rule 702's reliability threshold. *See Lutheran Homes, Inc. v. Lock Realty Corp. IX*, No. 1:14-cv-102, 2015 WL 8180196, at *7 (N.D. Ind. Dec. 7, 2015) ("[B]ecause [the expert] was qualified based on his experience in the field and adequately traced his reasoning from that experience to his conclusions, the absence of a formal, scientific methodology does not justify the exclusion of his testimony."). It is also worth noting that Ms. Romero does not—and Hunting need not—purport to identify a specific cost or amount of time it would take to reverse engineer the pipe. The relevance of this testimony is that information constitutes a trade secret only if it is not "readily ascertainable by proper means," meaning that duplicating the information would require "a substantial investment of time, expense, or effort." *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 919 (Ind. 1993). If Hunting was required to prove a specific amount of time or money that would be required to recreate its specification, perhaps a more formal or searching methodology would be warranted. As it is, however, Ms. Romero opines at a relatively high level of generality that reverse engineering the specification would be time-consuming and costly. She adequately grounds that opinion in her knowledge and experience in manufacturing and testing the pipe—explaining why it would take time and what

would generate the costs—so her opinion is admissible under Rule 702. Accordingly, the Court denies the motion to strike Ms. Romero's opinions.

## IV. MOTION FOR SUMMARY JUDGMENT

Next, the defendants moved for summary judgment. Hunting asserts four claims against the defendants. The first, against Mr. Kavadas and Tuff Rod, is for misappropriation of trade secrets. The remaining claims are against Mr. Kavadas only. They assert that he breached the confidentiality and non-compete provisions in his contract; violated his duty of loyalty to Hunting; and committed fraud. The defendants move for summary judgment on all claims.

### A.     Misappropriation of Trade Secrets

First, Hunting asserts a claim against both Mr. Kavadas and Tuff Rod for misappropriation of trade secrets. Hunting identifies a number of categories of trade secrets that it alleges the defendants wrongfully used in furtherance of Tuff Rod's business. Those include the specification and drawings for Hunting's drill pipe, as well as other internal information such as its sales data and projections. Hunting alleges that Mr. Kavadas accessed and relied on that information both in developing Tuff Rod while he was still employed by Hunting, and in conducting Tuff Rod's business after it was formed.

Indiana's Uniform Trade Secrets Act provides a cause of action for misappropriation of trade secrets. Ind. Code § 24-2-3-4. A "trade secret" is defined as:

> Information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1)   derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (2)  is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 24-2-3-2. A protectable trade secret thus has four characteristics: "(1) information, (2) which derives independent economic value, (3) that is not generally known, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy." *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 179 (Ind. Ct. App. 2007). The statute also defines "misappropriation," in relevant part, as the "disclosure or use of a trade secret" by a person who "knew or had reason to know that his knowledge of the trade secret was: . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) derived from or through a person who owed a duty . . . to maintain its secrecy or limit its use." Ind. Code § 24-2-3-2.

In moving for summary judgment, the defendants argue that some of the information is readily ascertainable by proper means, or that Hunting has not taken reasonable efforts to maintain its secrecy, so it does not constitute a trade secret. They further argue that there is no evidence that they misappropriated any of the information in question. The Court need not address every category of trade secrets at issue, as there is ample evidence from which to find that Hunting's specification and drawings for its drill pipe, and its sales data and forecasts, constitute trade secrets and that the defendants misappropriated that information, so summary judgment is unwarranted on this claim.

First, the defendants argue that the information in the specification and drawings for Hunting's drill pipe is readily ascertainable by proper means, so it cannot constitute a trade secret. They argue that the chemistry of Hunting's pipe can be reverse engineered through

chemical testing,[6] and that the completed pipes can be measured to determine their dimensions. To be a trade secret, information must not be "readily ascertainable by proper means." *Id.* § 24-2-3-2. That does not mean, though, that it must be impossible, or even economically infeasible, to ascertain the information by proper means. *Amoco*, 622 N.E.2d at 919. Rather, information qualifies for protection as a trade secret if duplicating the information "requires a substantial investment of time, expense, or effort." *Id.*

Hunting has offered sufficient evidence to create a dispute of fact as to whether this information is readily ascertainable by proper means. The defendants argue that chemical composition of the pipe can be determined by performing a simple test on a finished pipe. As discussed already in relation to Ms. Romero's opinion, however, such a test would offer only limited information. The specification does not set forth a specific recipe with precise amounts, as if for baking a cake; it identifies acceptable ranges of each of the various alloying elements (and maximum levels for any contaminants) in the pipe. A chemical test would not reveal those ranges; it would offer only a single data point. Determining the chemistry set forth in the specification would thus require many tests on many different samples from many different pipes. Even the defendants' expert conceded that it would be very unlikely that someone could reverse engineer the exact formula in Hunting's specifications. And Ms. Romero opined that reverse engineering the pipe, even with the use of the chemical tests, would be very expensive and time-consuming. Moreover, in addition to the chemistry, the specification contains some information relating to Hunting's testing and quality requirements, which would not be revealed by any test.

---

[6] To be clear, the defendants do not claim that they did reverse engineer Hunting's pipe, only that it would be possible to do so.

The defendants likewise argue that the dimensions in Hunting's drawings for its pipe could be ascertained by simply measuring finished products. Again, however, Hunting's drawings set forth the acceptable ranges for the particular dimension at issue—the "tong space"—not a single length that could be measured from any pipe. In addition, the drawings at issue reflect the acceptable range of tong-space dimensions for "as-forged" pipe, meaning before the pipe undergoes threading and other finishing. Measuring finished pipe would not necessarily reveal those dimensions. These facts suffice to at least create a dispute of fact as to whether duplicating this information would require a substantial investment of time, expense, or effort, so summary judgment on that issue is unwarranted.

The defendants also argue that Hunting has not taken sufficient efforts to maintain the secrecy of the information in question, but again, there are genuine disputes of fact on that question. The defendants note that Hunting does not place the word "confidential" on its specification, and they suggest that Hunting has provided the specification to its suppliers without having a confidentiality agreement in place. However, Hunting's general manager submitted an affidavit stating that Hunting's policy is to disclose its specification and drawings to a supplier only if they have an executed confidentiality agreement in place. To his knowledge, Hunting has never disclosed that information without such an agreement. Hunting has also identified a number of steps that it takes to protect the confidentiality of its specification and drawings and other confidential information. Hunting's personnel policies prohibit the unauthorized use or disclosure of confidential information, prohibit the use of cameras in a manner that could disclose Hunting's confidential information, and prohibit the use of removable media devices (like thumb drives) for storing confidential information. Hunting requires its employee to sign written acknowledgments of its policies. Hunting's computer system is

password protected, and employees are required to maintain complex passwords. Hunting also keeps its specification and drawings on a protected server and limits access to that server to employees with a business reason to know the information.

The owner of a trade secret need only take "reasonable" steps to maintain the secrecy of the information; "overly extravagant" measures and "[a]bsolute secrecy" are not required. *N. Elec. Co., Inc. v. Torma*, 819 N.E.2d 417, 427 (Ind. Ct. App. 2004). Even if Hunting could have done more, or may have imperfectly implemented its secrecy measures in some instances, a jury could find that Hunting has at least taken reasonable steps to protect its information. *See Bodemer v. Swanel Beverage, Inc.*, 884 F. Supp. 2d 717, 727 (N.D. Ind. 2012); *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 759 N.E.2d 239, 246–49 (Ind. Ct. App. 2001). Thus, summary judgment is not warranted on that basis.

Finally, a jury could find that the defendants misappropriated the information in question. The possibility of an adverse inference is itself enough to deny summary judgment on this issue. The destroyed evidence could have shown that Mr. Kavadas sent Hunting's confidential information, including its specification, to Tuff Rod's supplier, and that he was accessing the confidential information at the same time he was preparing Tuff Rod's sales projections or "tweaking" its chemistries. Summary judgment is thus unwarranted for that reason alone.

Even aside from the adverse inference, there is ample evidence from which a jury could find that the defendants misappropriated Hunting's trade secrets. As to the tong space dimensions, Mr. Kavadas asked Wuxi in January 2014 if he could give him the dimensions for Vermeer's pipe, but Wuxi declined, stating that he signed a confidentiality agreement with Vermeer. Mr. Kavadas forwarded that email to his partners, stating "Need to move to plan B for tong space dimensions." [DE 124-9]. Two weeks later, Mr. Kavadas sent the supplier a list of

30

tong space dimensions that exactly matched the dimensions in Hunting's drawings. Mr. Kavadas states that he came up with those dimensions by looking at Hunting's finished pipes and comparing the dimensions to the length of his phone. But a jury could easily reject the story that Mr. Kavadas determined dimensional *ranges* that just happened to match Hunting's drawings exactly by eyeballing the pipes in that manner. In addition, the dimensions were all in quarter-inch increments, yet Mr. Kavadas wrote them with decimals to the thousandth of an inch (e.g., 5.000–5.500). That would be odd if he had actually just measured them in comparison to his phone, but that is exactly how the dimensions appear in Hunting's drawings.

As to Hunting's specification, Mr. Kavadas admitted that he relied on Hunting's specification in order to create Tuff Rod's, other than for its chemistry. The chemistry in Tuff Rod's specification is not the same as Hunting's, but the format and much of the content (including the testing and quality control components) were taken verbatim from Hunting's specification. Hunting's expert also opined that Tuff Rod's chemistry became closer to Hunting's chemistry over time. Over that period, Mr. Kavadas, who is not a metallurgist, suggested a number of "tweaks" to the formula. Hunting argues that the likely explanation is that Mr. Kavadas was relying on Hunting's specification in order to tweak Tuff Rod's formula to more closely approximate Hunting's.

A jury could also find that the defendants misappropriated Hunting's sales data and projections. While still employed with Hunting, Mr. Kavadas created detailed projections for Tuff Rod's sales, and he updated those projections a number of times, including in January 2014. Just prior to that, Hunting had held its annual sales meeting. At those meetings, each salesperson would typically present information about their own territories, including their sales performance over the preceding year and their goals and strategies for the coming year. For the January 2014

meeting, though, Mr. Kavadas collected that information from each of the other salespeople to compile into a single presentation. In an email to his supplier shortly thereafter, in which he discussed Tuff Rod's plan to begin placing orders, Mr. Kavadas stated that he had "spent the last couple months (especially the last 4 weeks) learning what each company wants and needs." [DE 124-3 p. 47]. Mr. Kavadas was unable to explain at his deposition what he had been doing to learn the companies' needs. A jury could conclude that this was a reference to the sales data and forecasts that Mr. Kavadas had received relative to Hunting's sales meeting. A jury could thus find that Mr. Kavadas had improperly used this information in preparing his forecasts for Tuff Rod's sales.

The defendants argue that this would not constitute misappropriation because Mr. Kavadas did not acquire the information by improper means, since he acquired it through his employment. Acquiring trade secrets by improper means is one method of committing misappropriation, but not the only one. Misappropriation also occurs when someone who acquires the information under circumstances giving rise to a duty to maintain its secrecy discloses or uses the information without consent. Ind. Code § 24-2-3-2. Mr. Kavadas had a duty to keep Hunting's information confidential, and a jury could find that he used or disclosed that information without Hunting's consent. Accordingly, the Court finds that summary judgment on the claim for misappropriation of trade secrets is unwarranted.

**B.    Breach of Contract**

Hunting next asserts a claim against Mr. Kavadas for breach of contract, based on the agreement he signed in 2009 regarding non-disclosure of confidential information and a covenant not to compete. In moving for summary judgment on this claim, Mr. Kavadas first argues that the 2009 agreement is no longer operative, and that it was superseded by a separate

agreement he signed in 2013. Next, he argues that the non-compete provisions in the agreement are unenforceable because they are unreasonably overbroad.

### 1.    Applicability of the 2009 Agreement

Mr. Kavadas first argues that the 2009 agreement is no longer in effect because it was superseded by a subsequent contract signed in 2013. The 2009 agreement is a five-page document that addresses Hunting's confidential information, Hunting's ownership of any inventions, and Mr. Kavadas' obligation not to compete with Hunting for two years after the termination of his employment. The agreement was not signed in conjunction with any employment agreement, and it did not address Mr. Kavadas' job duties or compensation. Several years later, Mr. Kavadas' supervisor asked him to consider accepting a new compensation structure under which his compensation would be based more on commissions. The supervisor gave him a two-page offer letter setting out the details. It first included a description of the job duties, and then outlined the details of the salary and commission, benefits, and reimbursements. The letter did not acknowledge or address the 2009 non-compete agreement, nor did it contain any terms relating to confidential information, inventions, or restrictive covenants. Mr. Kavadas chose to accept the offer letter and signed it in 2013

Mr. Kavadas argues that the 2013 offer letter superseded the 2009 agreement, rendering the 2009 agreement unenforceable. Hunting disagrees, arguing that the 2013 offer letter only addressed Mr. Kavadas' compensation and had no effect on the 2009 agreement, which addressed a different subject matter.[7] In support of his argument, Mr. Kavadas relies heavily on

---

[7] The Court could not grant summary judgment in Mr. Kavadas' favor for a different reason, regardless of how the Court resolved this particular dispute. The 2009 agreement states that it can only be modified or amended "in writing signed by an officer of [Hunting] and [Mr. Kavadas]." The 2013 offer letter that is in the record is not signed by either party, and while Mr. Kavadas states in his affidavit that he signed the offer letter, neither party cites evidence that an

the following provision at the end of the offer letter: "You acknowledge that this offer letter represents the agreement between you and Hunting Energy Services and that no verbal or written agreements, promises or representations that are not specifically state[d] in this offer, are or will be binding upon Hunting Energy Services." [DE 112-1 p. 7]. Mr. Kavadas argues that this provision establishes that the 2013 offer letter is the only agreement between the parties, and that no previous agreements, including the 2009 agreement, remain binding.

Mr. Kavadas' argument fails to account for the last four words of that provision—that no other agreements will be binding "upon Hunting Energy Services." With that limitation, this provision actually weighs heavily in Hunting's favor. Given that the offer letter modifies the terms of Mr. Kavadas' compensation—an obligation that Hunting owes to Mr. Kavadas—it makes perfect sense for the letter to clarify that no previous agreement will be binding *upon Hunting*, such that it could be bound to pay him any additional amounts. The offer letter does not say, though, that no previous agreements would be binding *on Mr. Kavadas*. Again, that makes perfect sense under Hunting's interpretation, as the offer letter does not alter Mr. Kavadas' duties, only the structure of his compensation. If the 2013 offer letter was meant to supersede the 2009 agreement—an obligation Mr. Kavadas owes to Hunting—this provision would be mutual, but instead it specifies that no previous agreement would be binding upon Hunting. Thus, this provision does not indicate that the parties intended for the 2009 agreement to be no longer binding upon Mr. Kavadas.

Without any provision in the 2013 offer letter stating that it supersedes the 2009 agreement, the 2009 agreement remains in effect. In Indiana, "a written contract merges all prior

---

officer of Hunting signed it as well. Since the Court agrees with Hunting that the 2009 agreement was not superseded by the 2013 offer letter, though, the Court need not rest on that basis.

and contemporaneous negotiations *in reference to the same subject*." *Buschman v. ADS Corp.*, 782 N.E.2d 423, 429 (Ind. Ct. App. 2003) (emphasis added); *see also Skaggs v. Merchants Retail Credit Ass'n, Inc.*, 519 N.E.2d 202, 204 (Ind. Ct. App. 1988) ("It is an old rule in Indiana that where a contract embraces the entire substance of a former contract, with some variations, the first contract is merged in the second."); *GCIU Emp. Ret. Fund v. Chi. Tribune Co.*, 66 F.3d 862, 865 (7th Cir. 1995) ("The fact that an agreement is completely integrated does not, of course, affect an attempt to show an entirely separate and distinct agreement between the same parties." (quoting E. Farnsworth, *Contracts* § 7.3 at 207 (1990))); Restatement (Second) of Contracts § 213 ("A binding completely integrated agreement discharges prior agreements *to the extent that they are within its scope*." (emphasis added); *id.* cmt. c ("Where the parties have adopted a writing as a complete and exclusive statement of the terms of the agreement, even consistent additional terms are superseded. But there may still be a separate agreement between the same parties which is not affected.").

Here, the two agreements address different subject matters, so the 2013 offer letter does override the terms of the 2009 agreement. Both agreements include the same parties and pertain in general to Mr. Kavadas' continued employment, but the overlap stops there. The 2009 agreement addresses Mr. Kavadas' duties not to disclose Hunting's confidential information, to transfer ownership of any inventions to Hunting, and to refrain from competing against Hunting after his employment ends. That agreement does not address the scope of Mr. Kavadas' job duties or his compensation. By contrast, the 2013 offer letter only addresses the scope of Mr. Kavadas' job duties and his compensation, and it says nothing about Hunting's confidential information, ownership of inventions, or any restrictive covenants. Plainly, these agreements

were meant to address separate topics, and Mr. Kavadas offers no reason to conclude that one was meant to supplant the other.

Mr. Kavadas also argues that since the 2009 agreement referred to prior confidentiality agreements, that shows that Hunting knew how to address the effect of prior agreements when it wanted to. *See Burford v. Accounting Practice Sales, Inc.*, 786 F.3d 582, 587 (7th Cir. 2015); *Delta Mining Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1404 (7th Cir. 1994). He thus argues that since the 2013 offer letter did not expressly incorporate the 2009 agreement, that must mean that Hunting did not intend to preserve that agreement. First, the Court doubts the usefulness of that comparison between two such different contracts. The 2009 agreement was a formal, deliberately drafted document; the 2013 offer letter was drafted years later, and was a two-page agreement that outlined its terms in a bullet-point-like fashion, often without even using complete sentences. That the more formal document addressed an issue in one fashion offers little insight into the interpretation of a document drafted years later under different circumstances. Assuming this principle applies here, though, the Court believes that it would cut in the other direction. The 2009 agreement states that it "shall incorporate and/or supersede" the term of the previous confidentiality agreement. The 2013 offer letter does not identify any previous agreement or state that it intended to supersede such an agreement, which indicates that it did not intend to do so.

Moreover, applying this principle within the 2013 offer letter itself strongly favors Hunting, as already discussed. That the offer letter specified that no previous agreements would be binding "upon Hunting" shows that the drafter knew how to relieve a party of its obligations under prior agreements when it wanted to. *Delta Mining*, 18 F.3d at 1404. Its failure to likewise

specify that no previous agreements would be binding *upon Mr. Kavadas* shows that it did not intend to relieve Mr. Kavadas of his obligations under the previous 2009 agreement.

Finally, Mr. Kavadas argues that any ambiguity should be resolved against Hunting as the drafter of the agreements. The Court does not find there to be an ambiguity in this respect, though. The 2013 offer letter does not state that no prior agreement will be binding upon Mr. Kavadas, and the two agreements addressed different subject matters. Thus, there is no basis upon which to conclude that the 2009 agreement is no longer in effect in light of the offer letter. Accordingly, the Court cannot grant summary judgment on that basis.

### 2. Enforceability of the Non-Compete Agreement

Mr. Kavadas also argues that the non-compete portions of the agreement are unenforceable because they are overbroad. The Indiana Supreme Court "has long held that noncompetition covenants in employment contracts are in restraint of trade and disfavored by the law." *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 729 (Ind. 2008); *accord Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772, 780 (Ind. Ct. App. 2014). Indiana courts "construe these covenants strictly against the employer and will not enforce an unreasonable restriction." *Krueger*, 882 N.E.2d at 729; *Clark's Sales*, 4 N.E.3d at 780. "In order for a noncompetition agreement to be enforceable it must be reasonable, and such reasonableness is a question of law." *Clark's Sales*, 4 N.E.3d at 780; *Krueger*, 882 N.E.2d at 729. The employer bears the burden of proving that the agreement is reasonable. *Krueger*, 882 N.E.2d at 729.

To establish that a non-compete agreement is reasonable, an employer "must first show that it has a legitimate interest to be protected by the agreement." *Clark's Sales*, 4 N.E.3d at 780. Second, an employer must "show that the agreement is reasonable in scope as to the time, activities, and geographic area restricted." *Id.* The reasonableness of the scope of an agreement "depends on the interest of the employer that the restriction serves." *Krueger*, 882 N.E.2d at 730.

Mr. Kavadas does not dispute that Hunting has a protectable interest in its goodwill and its relationships with its customers. However, he argues that the scope of the agreement is overbroad as to the geographic area and the activities restricted.

The Court need not address the geographic scope of the agreement—which is limited to Hunting's customers with whom Mr. Kavadas "had material contact and dealings, directly or indirectly," within two years of the termination of his employment—because it agrees that the agreement is overbroad in the scope of activities restricted. "'A non-competition agreement drafted so broadly as to prohibit seemingly harmless conduct is not reasonable . . . . More specifically, a covenant restricting the employee from competing with portions of the business with which he was never associated is invalid.'" *MacGill v. Reid*, 850 N.E.2d 926, 930–31 (Ind. Ct. App. 2006) (quoting *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 214 (Ind. Ct. App. 1982)). Indiana courts "have found covenants not to compete that restrict an employee from working in any capacity for an employer's competitor or from working within portions of the business with which the employee was never associated to be unreasonable because such restrictions extend beyond the scope of the employer's legitimate interest." *Id.* at 932; *see also Clark's Sales*, 4 N.E.3d at 782.

The agreement here has each of those flaws. It states that Mr. Kavadas may not "call upon, compete for, solicit, divert, provide services to, or take away" any of the customers in question, or attempt to do any of those things. These restrictions would prevent Mr. Kavadas from working for or providing services to the customers in any capacity, regardless of whether that would entail any competitive threat to Hunting or would relate to Mr. Kavadas' employment with Hunting. It would prevent him from selling products to those customers that do not compete with Hunting's products, and it would also prevent him from selling competing products

38

unrelated to the HDD pipe that he sold for Hunting. The agreement thus extends beyond Hunting's protectable interests and is unenforceable. *Id.*; *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 175–77 (Ind. Ct. App. 2008); *MacGill*, 850 N.E.2d at 930–31; *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 214 (Ind. Ct. App. 1982).

In defending this aspect of the agreement, Hunting argues that by limiting the scope of customers as to whom Mr. Kavadas was restricted, the agreement also narrowed the scope of activities restricted. However, this argument conflates the geographic scope of the agreement with the scope of activities restricted as to those customers. To be enforceable, an agreement must be reasonable in scope "as to the time, activity, *and* geographic area restricted." *Krueger*, 882 N.E.2d at 729 (emphasis added). Those are distinct requirements, and Indiana courts have held that agreements were overbroad as to the scope of activity restricted even when the geographic scope was appropriately narrow. *E.g.*, *Pathfinder Commc'ns Corp. v. Macy*, 795 N.E.2d 1103, 1114 (Ind. Ct. App. 2003); *see MacGill*, 850 N.E.2d at 922–23 (declining to reach the geographic scope since the scope of activities restricted was overbroad). The customers affected here would only be those who bought drill pipe from Hunting, but the agreement does not limit Mr. Kavadas' activities with those customers only in regard to drill pipe—Mr. Kavadas would be prohibited from soliciting or providing any services at all to the customers to whom he sold drill pipe for Hunting, even if it had nothing to do with drill pipe.

Hunting suggests that the Court could cure any overbreadth by striking some of the activities specified in the agreement. *See Clark's Sales*, 4 N.E.3d at 783 ("[I]f the noncompetition agreement is divisible into parts, and some parts are reasonable while others are unreasonable, a court may enforce the reasonable portions only."). It proposes striking "call upon" and "provide services to," in which case the agreement would state that Mr. Kavadas

cannot "compete for, solicit, divert, or take away" Hunting's customers. The blue pencil doctrine is of no help here, though, as those activities are each overbroad as well.

Barring Mr. Kavadas from "soliciting" any of the customers would prevent him from selling products that do not compete with Hunting, which is unacceptable. The other activities come closer, as they at least imply competition in some respect with Hunting. They fall short, however, in that they do not require that the competition relate to the portion of Hunting's business with which Mr. Kavadas was involved. As already noted, "a covenant that restricts the employee from competing with portions of the business with which he was never associated is invalid." *Clark's Sales*, 4 N.E.3d at 782. Hunting is a large and multi-faceted company. According to its complaint, Hunting is "a leading provider of products and services to the upstream oil and gas industry," and offers "a broad range of products and services, including drilling tools, electronics, subsea products and manufacturing services, among others." [DE 38 ¶¶ 12–13]. Horizontal-directional drill pipe is one of many of Hunting's product lines, but it is the only one with which Mr. Kavadas was involved. The agreement, however, would prevent Mr. Kavadas from competing with Hunting for the customers in question as to any of its other activities.

In that respect, this case is difficult to distinguish from *Clark's Sales*. There, as here, the agreement prohibited the employee from providing any services "competitive to 'those offered by'" the employer. 4 N.E.3d at 782. Yet, as here, the employer offered a wide range of services, many of which were unrelated to the employee's employment. *Id.* The court held that the agreement was thus overbroad because it was "not limited to restricting [the employee] from providing those services that he actually provided to [the employer]." *Id.* Hunting attempts to distinguish *Clark's Sales* on the ground that the agreement there was also overbroad as to the

scope of customers involved. However, the court held that those were two separate flaws, not that one was overbroad because of the other. *Id.* ("*In addition to* the overly broad customer base referenced, the scope of activities prohibited . . . is *also* overly broad, as the activities prohibited are unrelated to the services [the employee] actually provided to [the employer] during his employment." (emphasis added)); *id.* at 784 (holding that, even if the scope of customers could be cured by blue-penciling, that modification "does nothing to remedy the overbreadth of the scope of activities prohibited"). Thus, the Court views *Clark's Sales* as conclusive on this issue.

There is no question that Hunting could properly prevent Mr. Kavadas from competing with it for sales of horizontal-directional drill pipe. The agreement here includes a restriction on those activities, but it is not limited to them. Because none of the activities specified in the agreement entail such a limit, the agreement is overbroad and cannot be salvaged by blue-penciling. Therefore, the Court grants the motion for summary on the breach of contract claim insofar as it is based on the non-compete portions of agreement. However, Hunting also bases this claim on the agreement's restrictions on Mr. Kavadas' use and disclosure of confidential information. Mr. Kavadas does not argue that those provisions are unenforceable (except to argue that the agreement as a whole was superseded, as already discussed), and for essentially the same reasons already discussed as to the trade secrets claim, the jury could find that Mr. Kavadas improperly used and disclosed Hunting's confidential information. Therefore, that aspect of the breach of contract claim remains pending.

## C.      Breach of Fiduciary Duty

Hunting next asserts a claim against Mr. Kavadas for breach of fiduciary duty. It argues that Mr. Kavadas beached this duty by beginning to compete against it while he was still its employee. In Indiana, an "employee owes his employer a fiduciary duty of loyalty." *SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952 N.E.2d 758, 768 (Ind. Ct. App. 2011);

accord *Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1070 (Ind. Ct. App. 2007). Thus, "an employee who plans to leave his current job and go into competition with his current employer must walk a fine line." *SJS Refractory*, 952 N.E.2d at 768. "Prior to his termination, an employee must refrain from actively and directly competing with his employer for customers and employees and must continue to exert his best efforts on behalf of his employer." *Id.* "An employee may make arrangements to compete with his employer, such as investments or the purchase of a rival corporation or equipment," but "cannot properly use confidential information specific to his employer's business before the employee leaves his employ." *Id.*

In moving for summary judgment, Mr. Kavadas argues that there is no evidence that he went beyond planning or preparing to compete while he was still employed with Hunting. *See Kopka*, 874 N.E.2d at 1071 ("[A]lthough an employee may not actively and directly compete with his current employer, he may prepare to do so without breaching his duty of loyalty."). The possibility of an adverse inference forecloses that argument, but there is sufficient evidence to avoid summary judgment on this claim even without an adverse inference. Mr. Kavadas argues that he did not discuss Tuff Rod with any of Hunting's customers before he left Hunting. This argument overlooks, however, that UTI was one of Hunting's customers. In fact, it was Hunting's largest customer. Yet Mr. Kavadas had been developing Tuff Rod for over a year with the principals of UTI, Mr. Burns and Mr. Lindahl. A jury could find that, at least as to UTI, Mr. Kavadas was no longer advancing Hunting's interests as he worked with his customer to form Tuff Rod in order to divert Hunting's sales to that customer. In addition, an employee can breach his duty of loyalty by using his employer's confidential information. *SJS Refractory*, 952 N.E.2d at 768; *Torma*, 819 N.E.2d at 430 (holding that, by misappropriating the employer's trade secrets and using them to compete against the employer after his employment, the employee violated his

fiduciary duty of loyalty). As already discussed, there is ample evidence that Mr. Kavadas used

Hunting's confidential information in furtherance of Tuff Rod's business. Accordingly, the Court

denies the motion for summary judgment as to this claim.

**D.    Fraud**

Finally, Hunting asserts a claim against Mr. Kavadas for fraud. This claim is based on

expense reports that Mr. Kavadas submitted for his trips to Minnesota to visit Hunting's

customers in the area, including UTI. As part of his job, Mr. Kavadas had to travel to visit

Hunting's customers. Hunting had three customers in Minnesota, so Mr. Kavadas would make

trips to Minnesota in which he would meet with each of those three customers on successive

days. Mr. Kavadas admits that during some of his visits to UTI, he also discussed Tuff Rod with

Mr. Burns and Mr. Lindahl. Hunting argues that by submitting expense reports for that travel

without disclosing that he was also discussing a competing business, Mr. Kavadas committed

fraud.

The elements of a claim of fraud are: (1) a material misrepresentation of past or existing

facts, (2) which was false, (3) which was made with knowledge or reckless ignorance of the

falseness, (4) was relied upon by the complaining party, and (5) proximately caused the injury.

*Reed v. Reid*, 980 N.E.2d 277, 292 (Ind. 2012). Hunting argues that Mr. Kavadas committed

fraud by making "material misrepresentations regarding the purpose and intent of his meetings

with UTI in Minnesota."[8] However, it does not identify any statements that Mr. Kavadas made

about the purpose or intent of those meetings. It relies only on the facts that Mr. Kavadas

submitted expense reports for those trips, and that he also discussed Tuff Rod on some of those

---

[8] Hunting's brief asserts that Mr. Kavadas' motion does not dispute this statement. To the
contrary, he expressly argued that he "did not make material misrepresentations regarding the
expenses incurred on his visits to Hunting's three dealers in Minnesota." [DE 110 p. 42].

trips. Hunting has not shown how that constitutes a fraudulent misrepresentation, as opposed to a breach of the duty of loyalty. Mr. Kavadas' job required him to travel to meet with Hunting's customers. UTI was Hunting's customer, as were the other two companies he met with on each of those trips. He therefore traveled to meet with those customers, and his expense reports included the costs for that travel. There is no evidence that Mr. Kavadas made any misrepresentations about those expense reports.

Hunting argues that it would not have reimbursed these expenses if it knew that Mr. Kavadas was also discussing Tuff Rod with a customer. That may be true, but Hunting likely would not have continued paying his salary either if it knew that he was planning on going into competition against it—that does not turn his breach of his duty of loyalty into fraud. There is no evidence that the expenses would have been any different had Mr. Kavadas not discussed Tuff Rod on any of those trips. That he seized on the opportunity to discuss Tuff Rod as well, or may have otherwise fallen short of Hunting's expectations of its employees, does not make the expense reports any more fraudulent than Mr. Kavadas' acceptance of his salary during that same period. Therefore, the Court grants the motion for summary judgment as to this claim.

## V.  MOTION TO STRIKE MR. JOHNSON'S DAMAGES OPINIONS

The defendants also move to strike the testimony by Hunting's damages expert, Chris Johnson. Mr. Johnson has bachelor's and master's degrees in economics, is a Certified Valuation Analyst, and has experience in economic and financial analysis. Hunting retained him as an expert witness to calculate the damages on each of its claims. The defendants do not dispute his qualifications, but they challenge the reliability and relevance of his opinions. However, as discussed below, the Court finds that the defendants' arguments predominantly address facts and assumptions underlying Mr. Johnson's opinions and the conclusions he reached, which are not grounds for striking expert opinions.

As to the claim for misappropriation of trade secrets, Mr. Johnson began by calculating Hunting's lost profits. Those consisted of lost profits on actual sales due to discounts Hunting had to offer to compete with Tuff Rod's bids, and lost profits on sales that Hunting lost to Tuff Rod. For the first category, Mr. Johnson added up the amounts of "bid assistance" that Hunting had to offer to its dealers to match competing bids by Tuff Rod, which came to $38,876. To determine Hunting's lost profits on lost sales, he first identified each of the Hunting customers that Tuff Rod sold product to. He then determined how many drill pipes Tuff Rod sold to each of those customers that corresponded to pipes that Hunting also offered. He assumed that, but for the misappropriation, Hunting would have instead made those sales. Because Tuff Rod's entry into the market did not expand the demand for drill pipe, and because customers' demand for drill pipe was based on the requirements of their projects and equipment, not the price of the drill pipe, he concluded that Hunting would have sold the same number of those pipes as Tuff Rod. He then calculated the profit that Hunting would have made on those lost sales, which was $1,669,348. Adding the losses on its actual sales, Hunting's total lost profits came to $1,708,224.

Mr. Johnson then calculated Tuff Rod's unjust enrichment as a result of the misappropriation. He began with the assumption that the alleged misappropriation of trade secrets is what allowed Tuff Rod to enter the market for drill pipe. He then determined that Tuff Rod's revenues on the sales of its drill pipe amounted to over $8 million. He then subtracted Tuff Rod's cost of goods sold of about $5 million. He also considered whether additional costs should be subtracted, and he considered Tuff Rod's financial information. However, he concluded that this information did not justify subtracting any additional costs. Thus, he concluded that Tuff Rod's unjust enrichment amounted to $3,117,940.

Next, Mr. Johnson calculated the amount of Hunting's lost profits, as already discussed, plus the amount of Tuff Rod's unjust enrichment on sales not reflected in Hunting's lost profits. To do so, he removed the sales that were reflected in his analysis of Hunting's lost profits from his analysis of Tuff Rod's unjust enrichment. He concluded that Tuff Rod's profits on sales that would not have been made by Hunting were $1,200,083. He added that amount to Hunting's lost profits, for a total damages calculation of $2,908,307.

As an alternative to the lost profits and unjust enrichment, Mr. Johnson also calculated a reasonable royalty as a measure of damages on the trade secrets claim. He considered a number of factors to try to identify a royalty agreement that could have resulted from a hypothetical arms-length negotiation between Hunting and Tuff Rod for the trade secrets at issue. He identified the assumptions upon which his opinion was based, and he explained each of the factors he investigated and considered in ascertaining a reasonable royalty, such as the amount of sales that Hunting stood to lose, the profits Tuff Rod could expect to earn, and the discount at which Tuff Rod expected to sell its product compared to Hunting's prices. He concluded that the parties would agree to a royalty that would cause Tuff Rod's products be sold for the same price as Hunting's, or a rate of 22 percent. That would amount to a damages award of $1,807,639.

Mr. Johnson then addressed the claim for breach of contract. As to this claim, he reiterated each of his opinions as to the misappropriation of trade secrets claim, except for the royalty. Finally, as to the breach of fiduciary duty claim, Mr. Johnson assumed that Mr. Kavadas began breaching his fiduciary duty in January 2013. The damages on that claim include the compensation that an employee earned during the period in which he was breaching his duty.

Mr. Johnson thus calculated Mr. Kavadas' compensation from January 2013 through March 2014, which came to $200,588.[9]

As discussed already, Rule 702 permits testimony by a qualified expert if the expert's testimony is helpful, is based on sufficient facts or data, and is the product of reliable principles and methods, and the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The Court has a gatekeeping role in admitting expert testimony, but its role is to evaluate "the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . ." *Id.*

Beginning with the trade secret claim, the defendants first object that Mr. Johnson failed to offer separate calculations of damages attributable to each of the ten categories of trade secrets that Hunting identified in discovery. There is no reason he needed to do so, though. Though it identifies various categories of trade secrets, Hunting asserts a single claim for misappropriation of trade secrets. To calculate damages for that claim, Mr. Johnson assumed that Tuff Rod would not have made any sales of drill pipe but for its misappropriation of trade secrets, and he then calculated the profits that Hunting lost on those sales. Of course, Hunting will have to offer evidence to prove that premise, and if the jury finds that Tuff Rod would have made any of those

---

[9] Mr. Johnson also attempted to calculate the damages for Hunting's fraud claim. To do so, he identified every expense that Mr. Kavadas reported from January 2013 on that "may relate" to a customer that later became a customer of Tuff Rod. He added those expenses to conclude that the damages for the fraud claim "could be as high as $17,209." [DE 107-1 p. 36]. Since the Court granted summary judgment on this claim, Mr. Kavadas' objections to this opinion are moot.

sales even without the use of any trade secrets it finds to have been misappropriated, the jury can discount or reject Mr. Johnson's opinion. But that is not a basis on which to exclude his opinion.

The defendants also argue that Mr. Johnson's opinion on lost profits should be excluded because he did not independently verify that the customers in question would have bought from Hunting if they had not bought from Tuff Rod, and did not independently verify the amounts of bid assistance that Hunting had to offer on its actual sales. In fact, the defendants object to nearly every opinion Mr. Johnson offers on the basis that he did not independently verify every fact or assumption upon which he relied. Again, however, there is no requirement that an expert do so. Experts are entitled to rely on facts and assumptions that are provided to them. They cannot simply parrot information provided to them by a party without bringing any expertise to bear on the subject,[10] *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) ("Relaying the plaintiffs' likely testimony is not an example of expertise."), but that does not mean that they must independently verify every fact or assumption they rely on, as the plaintiffs argue.

In *Tuf Racing*, the Seventh Circuit held that expert damages testimony was admissible when the expert relied on "financial information furnished by [the plaintiff] and assumptions given him by counsel." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). As the Seventh Circuit later observed, "[t]hat the expert accountant in *Tuf* could opine on future earnings on the basis of information supplied *by counsel* should make clear that the reliability of the data itself is not the object of the *Daubert* inquiry." *Manpower*, 732 F.3d at 808; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765–66 (7th Cir. 2013) (holding that questions as to the accuracy of one of the expert's factual assumptions were grounds for cross-

---

[10] The district court case on which the defendants rely involved this problem, but to the extent that case suggests that experts must further verify any fact or assumption upon which they rely, it is inconsistent with the Seventh Circuit's holdings.

examination, not exclusion of the expert's opinion).[11] Again, the defendants are free to dispute Mr. Johnson's premises, but that is not a ground to exclude his opinions. *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 741 (N.D. Ill. 2009) (rejecting a challenge in a similar case to expert testimony that took issue not with the expert's "calculations, but with her initial assumptions"). Mr. Johnson utilized his expertise in translating Tuff Rod's sales of these products to his calculation of Hunting's lost profits, so the Court denies the motion to strike his lost-profits opinion.

The defendants next argue that Mr. Johnson failed to reliably calculate their unjust enrichment. As the defendants note, unjust enrichment is measured by the defendant's net profits earned through the misappropriation. Mr. Johnson thus calculated Tuff Rod's sales, and then subtracted its costs of goods sold. Mr. Johnson further considered whether any additional amounts should be subtracted, but concluded that the evidence did not support any further adjustments. The defendants argue that the opinion is faulty because Mr. Johnson declined to make those reductions. The Court finds that this is another quarrel with his conclusions, not his methodology. *See Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). Mr. Johnson identified the proper standard and considered the information that the defendants cite; he just decided that the information did not support the reduction. [DE 107-1 p. 23; 123-8 p. 4–6]. Perhaps the jury will find he was incorrect, but the Court cannot exclude the opinion on that basis. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct."). Moreover, Indiana courts have held that "any doubts and

---

[11] The defendants similarly argue that Mr. Johnson failed to limit his calculation to the timeframe in which Tuff Rod could have reverse engineered the products. But Hunting's theory is that Tuff Rod would not have been able to recreate Hunting's pipe at all absent their misappropriation.

uncertainties as to proof of the exact measure of damages must be resolved against the defendant," as "[p]ublic policy and justice require that the risk of uncertainty in the computation of damages be borne by the wrongdoer." *Weston v. Buckley*, 677 N.E.2d 1089, 1093 (Ind. Ct. App. 1997). The court in *Weston* thus sustained a damages award for unjust enrichment even where, as here, there was a dispute as to whether the plaintiff had subtracted all relevant costs from the defendant's gross receipts. *Id.* Thus, the Court declines to strike Mr. Johnson's unjust enrichment opinion.

The defendants next object to Mr. Johnson's opinion as to a reasonable royalty as a measure of damages for the trade secrets claim. They first argue that the opinion is irrelevant because a royalty is only available when "neither damages nor unjust enrichment are provable." Ind. Code § 24-2-3-4(b). They argue that damages and unjust enrichment are provable, so a royalty is unavailable. Again, that is an argument for the jury. The Court has not granted summary judgment on this issue, and has no basis to prevent Hunting from presenting evidence on that issue. The fact that Mr. Johnson has also opined on Hunting's losses and Tuff Rod's unjust enrichment does not prevent him from offering this opinion, either; offering a fallback calculation of damages is not only permissible, it is prudent. The defendants also argue that Mr. Johnson failed to cap the royalty at the amount of money it would have taken Tuff Rod to reverse engineer the trade secrets. However, Mr. Johnson based his opinion on Hunting's contention that the defendants would not have been able to recreate Hunting's pipe if not for their misappropriation. Again, the defendants can contest that premise at trial, but Mr. Johnson's opinion cannot be excluded on that basis.

Mr. Kavadas next objects to Mr. Johnson's opinion as to the breach of contract claim. As to this claim, Mr. Johnson adopted his same calculations as the trade secret claim for Hunting's

lost profits, Tuff Rod's unjust enrichment, and their combination. Mr. Kavadas first objects that Mr. Johnson's calculation was not limited to the customers encompassed in his non-compete agreement or the term of that agreement. These objections are moot now that the Court granted summary judgment on that aspect of the claim. However, this claim was based equally on Mr. Kavadas' breach of the confidentiality provisions of the contract, which parallels the trade secrets claim. Mr. Johnson thus opined that Hunting's lost profits for the breach of contract claim were the same for the trade secret claim. Mr. Kavadas does not offer any additional objection to that aspect of this opinion, so the Court overrules the objection as to the lost profits due to the breach of contract.

Mr. Kavadas further objects to Mr. Johnson opining on Tuff Rod's unjust enrichment as a measure of damages for this claim. He argues that unjust enrichment is not a valid measure of damages for breach of a written contract. *See DiMizio v. Romo*, 756 N.E.2d 1018, 1025 (Ind. Ct. App. 2001) ("Unjust enrichment operates when there is no governing contract."); *Craftsman Chem. Corp. v. IVC Indus. Coatings, Inc.*, No. 2:15-cv-425, 2017 WL 365815, at *5 (S.D. Ind. Jan. 25, 2017) ("If an express contract governs the parties' relationship, 'a claim for unjust enrichment is not cognizable." (quoting *CoMentis, Inc. v. Purdue Research Found.*, 765 F. Supp. 2d 1092, 1102 (N.D. Ind. 2011))). Hunting does not argue to the contrary. Instead, it argues that Mr. Johnson's unjust enrichment calculations will come in anyway relative to the trade secrets claim, and that the Court will instruct the jury on the proper measure of damages on the contract claim. That argument overlooks, however, that Mr. Johnson expressly offers his unjust enrichment calculations as a measure of damages on the contract claim. Since there is no dispute that those damages are not recoverable on this claim, that aspect of his opinion is not relevant.

The Court thus strikes Mr. Johnson's opinions relative to Tuff Rod's unjust enrichment as to this claim; his opinion on the breach of contract claim will be limited to Hunting's lost profits.

Last, Mr. Kavadas objects to the calculation of damages on Hunting's breach of fiduciary duty claim. His objection largely reprises his argument in support of summary judgment, as he contends that he did not actually begin breaching his fiduciary duty during his employment, so Mr. Johnson should not have calculated damages beginning in January 2013. That is only a dispute with Mr. Johnson's assumptions, which is not a basis for striking his opinion. *Manpower*, 732 F.3d at 808 ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis."). The Court therefore denies the motion to strike as to this opinion.

## VI.  CONCLUSION

As to Hunting's motion for default judgment [DE 103], the Court DENIES the request for a default judgment, but GRANTS the motion in awarding lesser forms of sanctions, as outlined above. The defendants' motion for summary judgment [DE 108] is GRANTED in part and DENIED in part; their motion to strike Ms. Romero's opinions [DE 100] is DENIED; and their motion to strike Mr. Johnson's opinions [DE 105] is GRANTED in part and DENIED in part.

SO ORDERED.

ENTERED:  September 20, 2018

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court